**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

AUSTIN BELANGER,
on behalf of himself and all others
similarly situated,

       Plaintiff,

v.

ROUNDPOINT MORTGAGE
SERVICING CORPORATION, and
GREAT AMERICAN E&S INSURANCE
COMPANY and WILLIS OF OHIO, INC.
D/B/A LOAN PROTECTOR INSURANCE
SERVICES,

       Defendants.

_____/

**CLASS ACTION COMPLAINT**
**JURY DEMAND**

## CLASS ACTION COMPLAINT

Plaintiff Austin Belanger, a Senior Airman in the United States Airforce, files this class action complaint, on behalf of himself and all others similarly situated, against Defendants RoundPoint Mortgage Servicing Corporation ("RoundPoint"), Great American E&S Insurance Company ("Great American") and Willis of Ohio, Inc. d/b/a Loan Protector Insurance Services ("Loan Protector") (collectively, "Defendants").

## INTRODUCTION

1.     Undersigned Counsel have been litigating force-placed insurance ("FPI") class actions for more than six years in the Southern District of Florida and in other federal district courts nationwide. The FPI cases have been the subject of two different Multi District Litigation Panel ("MDL") hearings and have included the discovery of thousands of pages of documents and

dozens of depositions.  In early 2011, Undersigned Counsel filed the first of this wave of FPI cases in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.).  The *Williams* case was certified as a class action, eventually settled, and was granted final approval on September 11, 2013.

2.      Undersigned Counsel subsequently filed additional nationwide class actions and have been appointed Co-Lead Counsel in the Southern District of Florida and in the District of New Jersey  against many of the major mortgage lenders and servicers and their partner insurers. These cases were very actively litigated and Undersigned Counsel have now reached nationwide settlements in most of those cases certifying nationwide classes and providing more than $5.2 billion in monetary relief to over 4.7 million homeowners across the country, plus important injunctive relief which has helped to put an end to most of the alleged unlawful practices for at least five years.

3.      Defendants' main defense in nearly all of the cases has been that the "filed-rate doctrine" acts as a complete ban to all of plaintiffs' causes of action.  However, Great American acts as a surplus line insurer and thus does not file its FPI rates.

4.      This action seeks to redress for injuries resulting directly from Defendants' force-placed insurance practices.  Plaintiff and a proposed nationwide class and state subclass of RoundPoint borrowers seek to recover damages they have suffered as a result of Defendants' wrongful conduct in manipulating the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation and their standard practice of charging borrowers undisclosed and illegitimate costs in connection with force-placed insurance.

10P6117

5.     Founded in 2007, RoundPoint is a fully-licensed agency and non-agency subservicer for commercial banks, credit unions, mortgage companies and hedge funds. RoundPoint currently services over $75 billion worth of mortgage assets, which are comprised of its own assets and loans subserviced for many other investor types nationwide. RoundPoint is licensed to service loans in all fifty states, the District of Columbia, and the U.S Virgin Islands. RoundPoint is a seller and servicer for Fannie Mae and Freddie Mac. It is an approved single family issuer and servicer for Ginnie Mae, and maintains current MBS issuer eligibility. RoundPoint is also an approved servicer for the U.S. Department of Housing and Urban Development, the U.S. Department of Veterans Affairs, and the U.S. Department of Agriculture. In addition to servicing loans guaranteed by Fannie Mae, RoundPoint services for third parties and has an extensive portfolio of loans involved in FDIC structured and shared loss transactions.

6.     During the class period, RoundPoint, Great American, and Loan Protector engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in the purchase and placement of force-placed insurance coverage on behalf of RoundPoint borrowers in Florida and throughout the country.  Their exclusive and collusive relationship has resulted in extraordinary profits for all the Defendants totaling in the millions of dollars.

7.     RoundPoint has entered into agreements with Great American and Loan Protector that provide those companies with the exclusive right to monitor the entire RoundPoint loan portfolio and force-place their own insurance coverage pursuant to a master policy that covers the entire RoundPoint portfolio.  Great American and Loan Protector provide RoundPoint with various kickbacks that Defendants attempt to disguise as legitimate compensation. These kickbacks include but are not limited to one or more of the following: (1) unearned "commissions" paid to RoundPoint or an affiliate for work purportedly performed to procure individual policies; (2)

3

"expense reimbursements" allegedly paid to reimburse RoundPoint for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) payments of illusory reinsurance premiums that carry no commensurate transfer of risk; and (4) free or below-cost mortgage-servicing functions that Loan Protector and Great American perform for RoundPoint that often have nothing to do with the placement of insurance coverage.  Because of these kickbacks, RoundPoint essentially receives a rebate on the cost of the force-placed insurance. RoundPoint homeowners, however, ultimately bear the cost of these kickbacks because Defendants do not pass on these rebates to the borrowers. The charges for force-placed insurance are deducted from borrowers' escrow accounts and Defendants attempt to disguise the kickbacks as legitimate when, in fact, they are unearned, unlawful profits.

8.      During the proposed class period, Defendants treated Plaintiff and every putative class member in an identical manner pursuant to their standard policies and procedures by among other things: (1) notifying them that their coverage had lapsed and new coverage had been forced with the same cycle of form letters; (2) forcing coverage for every borrower from one master policy that covered RoundPoint's entire loan portfolio; (3) forcing new coverage in the same manner for every member of the proposed classes; and (4) including the same impermissible costs in the amounts charged every putative class member for coverage.

9.      This action seeks to redress for injuries resulting directly from Defendants' force-placed insurance practices.  Plaintiff does ***not*** challenge RoundPoint's contractual right to obtain force-placed insurance to protect its interest in Plaintiff's loan but instead challenges the manner in which RoundPoint has manipulated the force-placed insurance process to enrich itself, Loan Protector, and Great American at the expense of Plaintiff and the Class, and in violation of the mortgage agreements.

4

## PARTIES

10.     Plaintiff Austin Belanger was charged for force-placed insurance on his home in Navarre, Florida by Defendant RoundPoint. Pursuant to its exclusive arrangement with Loan Protector and Great American, and the master policy in place, and upon information and belief, RoundPoint purchased the force-placed insurance coverage through Loan Protector and Great American in 2016, and backdated the policy to August 2015. Mr. Belanger is a citizen of the State of Florida.

11.     RoundPoint is, and was at all relevant times, a corporation organized under the laws of Florida, with its principal place of business in Charlotte, North Carolina. RoundPoint services residential mortgage loans in Florida and throughout the United States, including loans within this district. RoundPoint serviced the Plaintiff's loans.

12.     Great American is a Delaware company with its headquarters in Cincinnati, Ohio. It is a surplus line insurance carrier in Florida, and throughout the country. Surplus line insurance carriers do not file their insurance rates with State insurance regulators and therefore their rates (and the ultimate insurance premiums) are not approved by the States.

13.     Willis of Ohio, Inc. d/b/a Loan Protector Insurance Services ("Loan Protector") is an Ohio corporation with its principal place of business in Colon, Ohio. It provides lender placed insurance and insurance tracking services to the mortgage servicing industry. Loan Protector provides lender placed insurance and outsourced insurance tracking programs to residential and commercial mortgage lenders and servicers across the United States. Loan Protector contracts with servicers and lenders to act as a force-placed insurance vendor. During the relevant time periods described in this Complaint, Loan Protector contracted as a force-placed insurance vendor with RoundPoint. Upon information and belief, Loan Protector, along with Great American, tracks

5

loans in RoundPoint's mortgage portfolio, handles customer service duties related to force-placed insurance, and issues certificates from the force-placed insurance master policy on properties when a borrower's insurance has lapsed.   At all relevant times described in this complaint, Loan Protector was acting as an agent, servant, employee, partner, and joint venturer of Defendants RoundPoint and Great American.   Loan Protector had actual or constructive knowledge of the acts of each of these Defendants, and ratified, approved, joined in, acquiesced in, or authorized the wrongful acts of each co-defendant, and retained the benefits of said wrongful acts.   Loan Protector was a direct, necessary, and substantial participant in the common course of conduct complained of herein, and was aware of its overall contribution to and furtherance of the conspiracy and common course of conduct.   Loan Protector conducts business throughout the United States, including Florida.

## NATURE OF THE CASE

14.     All mortgage lenders and servicers' force-placed insurance schemes operate in a materially similar fashion.   When a homeowner's voluntary insurance policy lapses, the mortgage servicer force-places insurance on the property and charges the borrower inflated amounts. Borrowers are told they will be charged the cost of coverage and contract to do so, but in fact pay an amount greater than what the mortgage servicer, here RoundPoint, ultimately pays for the force-placed insurance.   This is because after the servicer pays the insurer for the force-placed coverage, the insurer kicks back a percentage of the payment to the servicer or one of its affiliates.   The kickback essentially provides a rebate on the cost of the insurance coverage.   The benefit of that rebate is not, however, passed on to the borrower.

15.     The amounts charged to borrowers for forced coverage are also inflated to cover other costs that are properly borne by the loan servicer.   These kickbacks, which are described in

6

10P6117

greater detail below, not only allow the insurer to secure an exclusive relationship with the mortgage lender or servicer and keep the market closed, but also provide the participants in the scheme with millions of dollars in ill-gotten gains—all at borrowers' expense.

16.     The amounts charged to the borrowers by RoundPoint for forced coverage often have little to do with the actual risk insured or the value of the property, and are purely a function of this kickback scheme. This action seeks compensation for borrowers who have been victimized by this practice and an end to this illegal scheme.

17.     At all relevant times, RoundPoint purchased force-placed insurance through Loan Protector and Great American pursuant to a longstanding agreement whereby Great American furnished insurance coverage for the entire RoundPoint portfolio of mortgage loans under a master policy.  Loan Protector facilitates the arrangement by taking over certain mortgage servicing functions on behalf of RoundPoint, at below cost, including tracking the loans in the RoundPoint portfolio for lapses in insurance, and notifying Great American of any lapse so an individual certificate for the particular borrower's property can be issued under the master policy.

18.     This arrangement returns a significant financial benefit to RoundPoint that is unrelated to any contractual or bona fide interest in protecting RoundPoint's interest in the loan. Pursuant to its agreement, RoundPoint purchases insurance coverage with inflated prices from Great American, and in exchange, RoundPoint receives kickbacks from Great American and Loan Protector in the form of unearned "commissions," ceded premiums for riskless reinsurance, subsidies for below-cost mortgage servicing functions (that often have nothing to do with providing insurance coverage), or illusory "expense reimbursements," among other things, that amount to a rebate on the cost of the FPI to RoundPoint.  RoundPoint then imposes these inflated charges upon borrowers in amounts it claims to represent the cost of the insurance it paid for, but

in fact it is a greater amount than RoundPoint paid because the charges include the secret kickbacks and other illicit consideration that is remitted to RoundPoint, and that amount to a rebate that RoundPoint does not pass on to its borrowers.

19.     RoundPoint's desire to reap greater profits through its prearranged agreements with Loan Protector and Great American leads it to select high-priced insurance that includes a rebate to RoundPoint but subsequently charges its borrowers an amount that does not pass on the rebate. The charges RoundPoint imposes on borrowers, which RoundPoint attributes to the cost of the insurance, are not only greater than its actual cost of providing the insurance and the actual cost paid by RoundPoint, but also are usually greater than the premiums for the borrowers' voluntary insurance, even though the force-placed insurance typically provides less coverage.  Through this manipulation of the force-placed insurance selection process, RoundPoint maximizes its own profits and those of its co-Defendants to the detriment of Plaintiff and the Class members.

### The Force-Placed Insurance Industry

20.     Lenders and mortgage servicers, like RoundPoint here, force place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place coverage on the property to protect its interest in the loan and to charge the borrower the cost of coverage.

21.     Force-placed insurance schemes like the one at issue here take advantage of the discretion afforded to the lenders and servicers in standard form mortgage agreements.  The mortgage agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the

property at the borrower's expense.

22.     These schemes also violate the mortgage contract's express terms.  The borrower contracts to compensate the lender for the actual cost that the lender or servicer pays the insurer for the forced coverage, but is then charged an inflated amount – more than the lender or servicer actually paid.  Typically, lenders delegate to servicers the lenders' rights to enforce the terms of the mortgage contract.

23.     Force-placed insurance providers enter into exclusive relationships with servicers to provide the FPI policies.  To maintain their exclusive relationships with these servicers, the force-placed insurers, using an insurance agency like Loan Protector as a conduit, pay unearned kickbacks, often calculated as a percentage of the force-placed premiums and disguised as "commissions" or "expense reimbursements," offer subsidized mortgage servicing functions; enter into lucrative captive reinsurance deals with them; and/or provide other financial benefits not attributable to the cost of insuring the property.

24.     The money to finance these force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders or servicers.  Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above.  RoundPoint gets the benefit of an effective rebate from Great American that it does not pass on to the borrower.  Instead, it charges the borrower the full amount, purportedly for the cost of insurance coverage.  Lenders and servicers and their exclusive force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

25.     During a 2012 hearing on force-placed insurance at the National Association of

Insurance Commissioners ("NAIC"), Mr. Birny Birnbaum, an expert on the force-placed insurance market, illustrated the staggering growth in profits that force-placed insurance schemes have reaped in recent years:[1]

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC          13          August 9, 2012

26.     It is no surprise that these practices have come under increased scrutiny in recent years by the government and regulators:

- At hearings before the New York Department of Financial Services ("NYDFS") on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- In 2013, as a result of its investigation, the NYDFS entered into Consent

---

[1] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

Order with certain FPI providers that acknowledged that the "commissions" are unearned, noting, in relevant part:

> Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform.

- Similarly, the National Association of Insurance Commissioners (NAIC) has expressed concern with the "reverse competition" at play in the force-placed insurance market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices. On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obliged to pay the cost of the coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm

- The Consumer Financial Protection Bureau's new regulations on force-placed insurance became final on January 17, 2013 and prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[2]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things,

---

[2] *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/

10P6117

prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[3]

- In September 2015, an FPI provider, America Modern Insurance Group, and its related entities (together, "American Modern"), entered into a Consent Order[4] with the Florida Office of Insurance Regulation ("FLOIR") after FLOIR discovered massive issues with American Modern's force-placed insurance program, the Consent Order prohibited some of the same practices described in this Complaint including:

  o Paying commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer;
  o Issuing force-placed insurance on mortgaged property serviced by a bank or servicer affiliated with American Modern;
  o Reinsuring force-placed insurance policies with a captive insurer of any Servicer;
  o Paying contingent commissions based on underwriting profitability or loss ratios to any Servicer or person or entity affiliated with a Servicer;
  o Providing free or below-cost, outsourced services to servicers or their affiliates; and
  o Making any incentive payments, including but not limited to the payment of expenses, to servicers or their affiliates in connection with securing business;

- On May 6, 2016, American Modern entered into a Consent Order with the State of Minnesota Commissioner of Commerce, which included numerous pertinent findings of fact, including that American Modern:

  o Paid commissions to servicer-affiliated agencies in connection with its force placed products;
  o Paid commissions to insurance producers that are affiliates of Servicers;
  o Paid commissions to insurance producers that are not affiliates of Servicers;
  o Made other payments or discounts to servicers and their affiliates in connection with its force-placed products;

---

[3] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

[4] http://www.floir.com/siteDocuments/American_Modern_Insurance_Group_Inc%20_Consent_Order_174210-15-CO.pdf

10P6117

       o   Entered into agreements with servicers and their affiliates that provided for the payment of compensation.

27.     RoundPoint, Loan Protector, and Great American operate their force-placed scheme in the same manner as in the cases above.  Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiff and the proposed classes he seeks to represent.  This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by the Defendants.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

29.     Plaintiff Austin Belanger is a citizen of Florida who owns property in Florida on which insurance coverage was forced by Defendant RoundPoint through its exclusive arrangements.

30.     RoundPoint is a Florida corporation and registered to do business in Florida.  The amount in controversy exceeds \$5,000,000 and there are at least one hundred members of the putative class.

31.     This Court has subject-matter jurisdiction over this action because Plaintiff's claims arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), according to the statute's jurisdictional statement, 18 U.S.C. § 1964.  Further, pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction based on Plaintiff's claims for violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

32.     This Court has further jurisdiction over Defendants because they are either foreign

10P6117

corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

33.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and Defendants. 28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d) (2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

34.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

35.     All conditions precedent to this action have occurred, been performed, or have been waived.

**FACTUAL ALLEGATIONS**

36.     The standard form mortgage agreements for loans serviced by RoundPoint include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan.  In the event that the insurance lapses, the standard form mortgage agreements permit RoundPoint to

14

obtain force-placed coverage to protect the its interest in the loan and to charge the cost of the insurance to the borrower rather than declare the borrower in default.

37.    What is unknown to borrowers, and not disclosed in the standard form mortgage agreements, is that RoundPoint has exclusive arrangements with Loan Protector and Great American to manipulate the force-placed insurance market and artificially inflate the charges to Plaintiff and the Class members.  The charges are inflated to provide RoundPoint with kickbacks disguised as "commissions," or "expense reimbursements," or to provide RoundPoint with lucrative reinsurance arrangements that include unmerited charges, and to provide additional financial benefits in the form of below-cost mortgage servicing functions that are not attributable to the cost of insuring the individual property.

<b><u>Defendants' Force-Placed Insurance Scheme</u></b>

38.    Great American and Loan Protector have exclusive arrangements with RoundPoint to monitor RoundPoint's mortgage portfolios, perform various mortgage servicing functions (obligations properly borne by RoundPoint), and provide force-placed insurance coverage.  In addition to the subsidized mortgage services it receives, as set forth in detail below, RoundPoint is "kicked back" a percentage of the force-placed premium.

39.    The scheme works as follows:  RoundPoint purchases a master insurance policy from Great American that covers the entire RoundPoint portfolio of mortgage loans.  In exchange, Great American is given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's voluntary insurance lapses or RoundPoint determines the borrower's existing insurance is inadequate.

40.    Loan Protector and/or Great American monitor RoundPoint's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, they send a cycle of

10P6117

letters/notices, reviewed and approved by RoundPoint, to the borrower in RoundPoint's name, stating that RoundPoint will purchase insurance for the property, for which the borrowers will be financially responsible, and force-place it on the property.  In reality, however, the master policy is already in place and RoundPoint does not seek out and purchase a new policy on the individual borrower's behalf, rather, a certificate of insurance from the master policy is automatically issued by Loan Protector and Great American and RoundPoint is charged for that certificate.

41.     The letters or notices sent to borrowers are done pursuant to an automated system used by Great American and Loan Protector that generates and sends the letters at predetermined times.  The letters indicate an address for borrowers to submit proof of insurance or correspondence to RoundPoint; however, the address is actually for a Great American or Loan Protector location because they are performing these services for RoundPoint.  Each borrower is subject to Defendants' automated system and receives materially the same letters described above.

42.     Once a certificate is issued pursuant to the pre-existing master policy, coverage is forced on the property, and RoundPoint charges the borrower an amount they attribute to the "cost" of the force-placed insurance, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[5]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

43.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower.

---

[5] On some occasions, when a borrower does not have an escrow account, RoundPoint creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

44.     To fund the force-placed insurance scheme, RoundPoint pays for the certificate of insurance, which issues from the already-existing master policy.  RoundPoint, not the borrower, is obligated to pay Great American for the force-placed insurance pursuant to the agreements between Defendants, which govern the mortgage servicing functions that Great American and Loan Protector perform as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

45.     Once coverage has issued and RoundPoint has paid for the insurance, Great American kicks back a set percentage of the premium to RoundPoint as a "commission" or an "expense reimbursement."  The money paid back to RoundPoint and/or its affiliates is not given in exchange for any services provided by it; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, Great American or Loan Protector may disclose in the form letters sent to the borrower that RoundPoint may earn "commissions" as a result of the forced placement of new coverage, that RoundPoint incurred "costs" as a result of the force-placement of insurance, or that a "fee" is due to an agency.

46.     These payments are not compensation for work performed; they are an effective rebate on the premium amount owed by RoundPoint, reducing the cost of coverage that RoundPoint pays to Great American.  The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by RoundPoint or an affiliate related to the placement of the insurance; they are unlawful kickbacks to RoundPoint for the exclusive arrangement to force-place insurance.

47.     In reality, no work is ever done by RoundPoint to procure insurance for a particular borrower because the coverage comes through the master policy already in place and the procedures, including the issuance of the certificate of insurance, are automated.  RoundPoint does

17

not seek out insurance policies on a borrower's behalf and has no involvement in the placing of the insurance. As a result, the amount paid is not a true "commission," no income is "earned," and RoundPoint does not incur any "expenses" in relation to the force-placement of insurance for any particular borrower.

48.    In addition to these direct payment kickbacks, RoundPoint also enters into exclusive agreements whereby Great American and Loan Protector provide mortgage servicing functions on RoundPoint's entire loan portfolio at below cost. These functions, which include, but are not limited to activities such as "new loan boarding," "escrow administration," "customer service," and "loss draft services," are often not related to the provision of force-placed insurance and are performed at below cost as a way to keep the exclusive arrangement in place. Indeed, Great American does not perform these services for RoundPoint without also being the exclusive provider of force-placed insurance. Loan Protector does not perform these services for RoundPoint without also being the exclusive vendor for the procurement of force-placed insurance.

49.    Upon information and belief, Loan Protector and Great American are able to perform many of the mortgage servicing functions for RoundPoint at below-cost because of the funds received from the force-placed insurance charges, which subsidize any expenses incurred for performing the services.

50.    The borrower ultimately subsidizes the below-cost mortgage servicing through the inflated charges for FPI imposed by RoundPoint. However, because insurance-lapsed mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers, like Plaintiff here, who are charged for the force-placed insurance unfairly bear the cost to service and monitor the entire RoundPoint loan portfolio. These charges, passed on to Plaintiff and the

proposed classes, are not properly chargeable to the borrowers because they are expenses associated with the servicing of all the loans and often have nothing to do with the provision of FPI, and RoundPoint is already compensated for these activities by the owners of the loans (e.g. Fannie Mae).

51.     Thus, the small percentage of borrowers who are charged for force-placed insurance subsidize the costs of servicing RoundPoint's entire loan portfolio, effectively resulting in a kickback to RoundPoint to keep its exclusive arrangement in place with Loan Protector and Great American.

52.     In addition, upon information and belief, Great American enters into essentially riskless "captive reinsurance arrangements" with RoundPoint or its affiliates, to "reinsure" the property insurance force-placed on borrowers.   An *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program with Assurant, Inc. by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS[.]

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.   Further limiting competition are the companies' tendency to file identical rates in many

states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

53.     RoundPoint's reinsurance program, like those of other servicers, is simply a way to funnel profits from the force-placed scheme, in the form of ceded premiums, to RoundPoint at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  RoundPoint and/or its affiliates enter into reinsurance agreements with Great American that provide that the insurer will return to RoundPoint significant percentages of the premiums charged to borrowers by way of ceded reinsurance premiums to RoundPoint affiliates – which in turn provide these premiums to RoundPoint often in the form of "soft-dollar" or other credits.  The ceded premiums are nothing more than a kickback and a method for RoundPoint to profit from the forced placement of new coverage.  Indeed, while RoundPoint's affiliates purportedly provided reinsurance, they did not assume any real risk.

54.     The amounts charged to borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage.  When RoundPoint adds the cost of the high-price force-placed insurance to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

55.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize Defendants' profits at the expense of Plaintiff and the other Class members.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property, are charged inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to finance undisclosed kickbacks

to RoundPoint or its affiliates (who, as described above, perform little, if any, work related to the forced placement of the individual policies), as well as the cost of captive reinsurance arrangements and the provision of below-cost mortgage servicing functions.

56.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase their own force-placed insurance policy.  Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender and/or servicer, here, RoundPoint and the FPI providers, here, Great American.  Further, it is RoundPoint and not the borrower that is the Named Insured on the force-placed policies.

57.     Plaintiff does not challenge RoundPoint's right to force place insurance in the first instance.  He challenges the discretion afforded mortgage lenders and servicers in purchasing force-placed insurance, as well as Defendants' manipulation of the force-placed insurance market whereby Great American and Loan Protector provide kickbacks to RoundPoint to keep the exclusive arrangement in place.  These kickbacks provide an effective rebate to RoundPoint on the purchase of the force-placed insurance that RoundPoint does not pass on to the borrower.  Servicers, like RoundPoint, are financially motivated to select the insurer, like Great American, that offers the best financial benefit in the terms of "commissions," "expense reimbursements," direct payments, discounted mortgage servicing, or debt forgiveness.

58.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiff the excess amounts charged to him beyond the true cost of insurance coverage.  Plaintiff seeks to recover the improper charges passed on to him and other RoundPoint borrowers nationwide through his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of

10P6117

the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), TILA, and RICO.

**Plaintiff Austin Belanger**

59.     Plaintiff Belanger is a Senior Airman in the United States Airforce.

60.     Senior Airman Belanger took a mortgage loan from Prime Lending in April, 2015, secured by a mortgage on real property at 210 Ortega St, Navarre, Florida 32566.  At all times relevant to the allegations herein, Senior Airman Belanger's mortgage loan was owned and/or serviced by RoundPoint.

61.     Senior Airman Belanger's mortgage provides as follows:

> 5. **Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.

> * * * *

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

> * * * *

> 9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . .  then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

22

* * * *

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Mr. Belanger's mortgage is attached here as **Exhibit A**.

62.     Upon purchasing his property, Senior Airman Belanger also obtained a voluntary insurance policy from GulfStream Insurance Company with an annual premium of $1,138.00.

63.     However, while Senior Airman Belanger was deployed in Kuwait, GulfStream cancelled the policy because it had questions about the Plaintiff's dog.  Senior Airman Belanger was unaware of the cancellation as he was deployed overseas.

64.     Pursuant to the automated procedures in place, on March 22, 2016, a letter purporting to come from RoundPoint was sent to Senior Airman Belanger informing him that RoundPoint "plan[ed] to buy insurance for [his] property."  The letter stated that he "must pay us for any period during which the insurance we buy is in effect but you do not have insurance."

65.      Pursuant to the automated procedures in place, on April 21, 2016, a second letter purporting to come from RoundPoint was sent to Mr. Belanger informing him that RoundPoint "plan[ed] to buy insurance for [his] property." The letter stated that he "must pay us for any period during which the insurance we buy is in effect but you do not have insurance."  Further, the letter stated that the "insurance we buy: is estimated to cost $4,836.30."

66.     Pursuant to the automated procedures in place, on June 20, 2016, a third letter purporting to come from RoundPoint was sent informing Plaintiff Belanger that Roundpoint "bought insurance on your property and added the cost to your mortgage loan account."  However, because Defendants backdated the policy over 8 months to begin on August 3, 2015 and expire on

August 3, 2016, a second force placed policy was forthcoming.  The annual premium of the current policy was $4,836.30, and Defendants intended to renew the policy at the same price.

67.    Pursuant to the automated procedures in place, on July 5, 2016, a letter identical to the one sent on June 20, 2016 was sent.

68.    The letters did not disclose any aspect of the secret and illegal compensation arrangement entered into by Great American, Loan Protector, and RoundPoint, or inform Senior Airman Belanger that he would be charged illegitimate amounts beyond what RoundPoint actually paid for the cost of coverage.  Nor did the letters disclose to Senior Airman Belanger that the amounts being charged to him would be inflated to subsidize the cost of Loan Protector or Great American performing mortgage servicing functions for RoundPoint that have little or nothing to do with the provision of the force-placed insurance.

69.    The communications to Senior Airman Belanger were false and misleading. RoundPoint represented in the letters that it was charging him the amounts paid for the "cost" of the insurance.  However, the charges imposed on Senior Airman Belanger did not reflect RoundPoint's true cost of coverage because RoundPoint was receiving an effective rebate on the force-placed insurance through the kickback scheme described above.  RoundPoint, therefore, paid less for coverage than it represented to and charged Senior Airman Belanger and the Class members.

70.    The communications to Senior Airman Belanger were also misleading in that they represented that RoundPoint would "buy" or had "bought" or "purchased" the individual insurance for Senior Airman Belanger's property when an exclusive arrangement and master policy was already in place with Great American, and RoundPoint did not in fact, perform any additional work to procure coverage for Senior Airman Belanger's property.

10P6117

71.     It was never disclosed to Senior Airman Belanger or to the putative Class members that because of RoundPoint's kickback scheme, RoundPoint would be receiving a rebate and effectively be paying less for the force-placed insurance coverage than it would charge Senior Airman Belanger and the putative class.  Nor was it disclosed to Senior Airman Belanger or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

72.     Plaintiff Belanger was able to obtain a private insurance policy with an effective date of July 18, 2016, and the lender placed policy was cancelled effective of that date.

73.     Plaintiff Belanger paid the charges for the force-placed insurance.

74.     There were no material differences between RoundPoint's actions and practices directed to Plaintiff Belanger and its actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.  Class Definitions

75.     Plaintiff brings this action against RoundPoint pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiff seeks to represent the following two classes:

> (1) **Nationwide class:**
>
> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy through RoundPoint or its affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

> (2) **Florida Subclass with Mr. Belanger as the Class Representative**:
>
> All Florida borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy through RoundPoint or its affiliates, entities, or subsidiaries.  Excluded from this

25

> class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

76.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

77.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B. <u>Numerosity</u>**

78.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service hundreds of thousands of mortgage loans and insurance policies in the State of Florida, and nationwide.  The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants.  The precise number of Class members number at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**C. <u>Commonality</u>**

79.     There are questions of law and fact that are common to Plaintiff's and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

> a.  Whether RoundPoint breached its mortgage contracts with Plaintiff and the Class by selecting higher priced force-placed insurance policies in order to receive illegal kickbacks (in the form of unwarranted commissions, expense reimbursements, below-cost mortgage servicing, or reinsurance payments) and

26

by charging the higher cost to Plaintiff and the Class members;

b.   Whether RoundPoint breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected FPI insurers and/or their affiliates, which resulted in inflated amounts being charged to Plaintiff and the Class members;

c.   Whether RoundPoint manipulated the force-placed insurance procurement process in order to maximize its profits to the detriment of Plaintiff and the Class members;

d.   Whether RoundPoint or its affiliates performed any work or services in exchange for the "commissions" or other forms of kickbacks it collected;

e.   Whether the "expense reimbursements" received by RoundPoint are for true expenses or are just kickbacks pursuant to its exclusive relationship with Loan Protector and Great American;

f. Whether RoundPoint's charges are inflated to compensate for mortgage servicing activities that Loan Protector and/or Great American and its affiliates provide to RoundPoint, and which are not chargeable to Plaintiff and the Class members under the terms of their mortgages;

g. Whether the charges are inflated to include the cost of an unlawful captive reinsurance arrangement;

h.   Whether RoundPoint employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with content that others rely upon such concealment, suppression or omission by their arrangement, which incentivizes RoundPoint to charge inflated and unnecessary fees for force-placed insurance, and therefore violates FDUTPA;

i. Whether an objective consumer would be deceived by RoundPoint's FPI arrangement, whereby RoundPoint pays a reduced amount for FPI but charges its borrowers an inflated amount to cover the kickbacks it receives while representing that it is only charging the cost of insurance coverage, and therefore violates FDUTPA;

j.   Whether there was actually a transfer of risk under Defendants' purported reinsurance arrangement;

k.   Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

10P6117

l. Whether RoundPoint violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class members in their mortgages;

m. Whether Great American and Loan Protector intentionally and unjustifiably interfered with Plaintiff's and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to RoundPoint or its affiliates thereby inducing a breach of the contract;

n. Whether Defendants were associated with the enterprise and agreed and conspired to violate the federal RICO statutes; and

o. Whether Plaintiff and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.  Typicality**

80.    Plaintiff is a member of the Classes he seeks to represent.  Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.   Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

**E.  Adequacy of Representation**

81.    Plaintiff is an adequate representative of the Classes he seeks to represent and will fairly and adequately protect the interests of the Classes.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him.  There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a Class action.

82.    To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.  Requirements of Fed. R. Civ. P. 23(b)(3)**

83.    The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiff and the unnamed Class members are based on the force-placed insurance policies that RoundPoint unlawfully imposed and its deceptive and egregious actions involved in imposing the charges for the force-placed policies.

84.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

85.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is in the case at bar, common questions will be held to predominate over individual questions.

**G.  Superiority**

86.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the country;

(b) Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.   As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.   Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

87.   Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

88.   RoundPoint has acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**COUNT I**

**BREACH OF CONTRACT**
**(against RoundPoint)**

89.   Plaintiff re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

90.   Plaintiff and all similarly situated Class members have mortgages that were owned and/or serviced by RoundPoint.

91.   Plaintiff's and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by RoundPoint.  The force-placed provisions from Plaintiff's mortgage are set forth above and true and correct copies of the mortgage agreements are attached to this complaint as **Exhibit A**.

92.   Plaintiff's mortgage requires that he maintain insurance on his property and provides that if he should fail to do so, RoundPoint might obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the "cost of the

insurance coverage."  Plaintiff's mortgage further provides that RoundPoint may do and pay for whatever is reasonable or appropriate to protect its interest in the property and rights under the mortgage agreement, including protecting and/or assessing the value of the property and securing and/or repairing the property.

93.    RoundPoint charges borrowers amounts for force-placed insurance that are more than the actual amount it pays for the coverage because the charges include unearned "commissions" or "expense reimbursements" and other kickbacks, as well as subsidies for below-cost mortgage servicing functions that have little or nothing to do with the placement of force-placed insurance.  These costs are not costs of coverage, and are not applied to protecting RoundPoint's rights or risk in the collateral for borrowers' mortgage loans.  They are simply bribes to keep the exclusive relationship in place.

94.    Through the kickbacks it receives, RoundPoint pays less for force-placed coverage than it charges to Plaintiff and other Class members.

95.     RoundPoint breached the mortgage agreements by, among other things, charging Plaintiff and absent class members the amounts beyond the actual cost of coverage and more than what was reasonable or appropriate to protect its interest in the property.

96.    Plaintiff and the Class members have suffered damages as a result of RoundPoint's breach of contract.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, seeks compensatory damages resulting from RoundPoint's breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages.  Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against RoundPoint)

97.   Plaintiff re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

98.   A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

99.   Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

100.  Plaintiff's and the Class members' mortgage contracts allow RoundPoint to force-place insurance coverage on borrowers in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

101.  RoundPoint was afforded substantial discretion in force-placing insurance coverage.   It was permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured without restriction.  RoundPoint had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

102.  The purpose of the mortgage clause allowing a servicer, like RoundPoint, to force place insurance is to protect the servicer's interest in the property that is collateral for the mortgage loan.   RoundPoint breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiff's expense through force-placing insurance on the property and

32

receiving kickbacks on that insurance that bore no relation to protecting its interest in the property.

103.  RoundPoint further breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the force-placed insurance market by selecting insurers that will artificially inflate premiums to include kickbacks to RoundPoint not necessary to cover RoundPoint's risk;

(b) Exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize RoundPoint's own profits;

(c) Assessing inflated and unnecessary charges against Plaintiff and the Classes which RoundPoint attributes to the cost of the insurance coverage;

(d)  Receiving an effective rebate on the force-placed insurance through the kickback scheme but not passing on that rebate to the borrowers, thereby creating the incentive to seek the highest-priced premiums possible;

(e) Charging Plaintiff and the Classes for "commissions" or "expense reimbursements" when the insurance is prearranged and no commission is earned or due and no expenses are incurred in placing the certificate of insurance;

(f)  Charging Plaintiff and the Classes the cost of having Loan Protector and Great American perform its obligation of servicing its entire mortgage portfolio, which is not properly chargeable to Plaintiff or the Classes;

(g) Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements;

(h) Seeking out a force-placed insurance insurer that will provide it the best deal in terms kickbacks and below-cost mortgage servicing functions with the knowledge that these functions will be subsidized by the amounts paid for force-placed insurance;

(i)  Force-placing insurance coverage in excess of that required to cover its interest in the property; and

(j)  Charging Plaintiff and the Classes an inflated charge for the force-placed insurance due to the captive reinsurance arrangement.

104. As a direct, proximate, and legal result of the aforementioned breaches of the

covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members, seeks a judicial declaration that RoundPoint's conduct described above and the amounts charged to borrowers are in contravention of RoundPoint's duties of good faith and fair dealing. Plaintiff also seeks compensatory damages resulting from RoundPoint's breaches of its duties. Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

<u>COUNT III</u>

<u>VIOLATION OF THE FLORIDA DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT</u>
<u>(Plaintiff Belanger on behalf of the Florida Subclass against RoundPoint)</u>

105. Plaintiff Belanger re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

106. FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

107. Plaintiff Belanger and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

108. RoundPoint has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

109. The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated charges for force-placed insurance by Plaintiff and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for RoundPoint.

110. Specifically, RoundPoint had an exclusive relationship with Loan Protector and

Great American, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the Florida Subclass, and then receive compensation through kickbacks, discounted mortgage services, or captive reinsurance arrangements that resulted in an effective rebate for RoundPoint that was never passed on to Plaintiff and the Florida Class members.

111. RoundPoint's conduct of charging inflated amounts for the force-placed coverage to Plaintiff Belanger and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

112. RoundPoint is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, it is not a bank or savings and loan association regulated by federal agencies.

113. Plaintiff Belanger and the Florida Subclass have sustained actual damages in the form of as a direct and proximate result of RoundPoint's unfair and unconscionable practices. Section 501.211(2), Florida Statutes, provides Plaintiff and the Florida Subclass a private right of action against these Defendants and entitles them to recover their actual damages, plus attorneys' fees and costs.

114. Plaintiff and the Florida Subclass have suffered and will continue to suffer irreparable harm if RoundPoint continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff Belanger, on behalf of himself and the Florida Subclass, demands judgment against RoundPoint for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action,

and any other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT[6]

115.    Plaintiff Belanger re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

116.    RoundPoint receives a rebate on the cost of the force-placed insurance coverage but does not pass that rebate on to its borrowers.  The rebates are provided to RoundPoint in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and free or below-cost mortgage servicing functions.  These benefits to RoundPoint are paid through the amounts charged to Plaintiff and the Class members for force-placed insurance.

117.    RoundPoint entered into an agreement whereby the insurance vendors – Great American and Loan Protector – would provide below cost mortgage servicing activities and cover RoundPoint's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed.  RoundPoint would then charge Plaintiff and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.  The force-placed policies imposed on borrowers therefore cost less than what RoundPoint had actually paid for them.

118.    Commissions or kickbacks were paid directly to RoundPoint or its affiliates in order to be able to exclusively provide force-placed insurance policies.  Great American and Loan

---

[6] Plaintiff pleads his unjust enrichment claim against RoundPoint in the alternative to his contractual claims against it.

Protector were mere conduits for the delivery of the kickbacks and improper rebates to RoundPoint or its affiliates.

119.   These payments directly benefitted RoundPoint and were taken to the detriment of the borrower.   The kickbacks (in the form of expense reimbursements, commissions, or reinsurance arrangements, as well as subsidized mortgage servicing functions) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.   Therefore, RoundPoint had the incentive to seek out unreasonably inflated prices for the force-placed insurance and charge the inflated amounts to borrowers.

120.   Further, RoundPoint was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans.

121.   As a result, Plaintiff and the Class members have conferred a benefit on RoundPoint.

122.   RoundPoint had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

123.   Had Plaintiff known the true facts behind RoundPoint's force-placed insurance scheme, that the charges from RoundPoint included the kickbacks described above, and that RoundPoint was receiving an effective rebate on the charges but not passing on that rebate to him, he would have expected remuneration from RoundPoint.

124.   RoundPoint will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which RoundPoint was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated Class members,

demands an award against RoundPoint in the amounts by which it has been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
### (against RoundPoint)

125.    Plaintiff re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

126.    Plaintiff's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

127.    RoundPoint is a "creditor" as defined by TILA because it owned or serviced Plaintiff's mortgages and changed the terms of the mortgage so as to create a new mortgage obligation, of which RoundPoint was the creditor.

128.    Pursuant to TILA, RoundPoint was required to accurately and fully disclose the terms of the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

129.    RoundPoint violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan servicing, and/or other profiteering involving RoundPoint and/or its affiliates as a result of the purchase of force-placed insurance.

130.    When RoundPoint changed the terms of Plaintiff's mortgage to allow previously

38

unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation.  Under TILA, RoundPoint was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof.   On information and belief, to the extent a borrower cannot pay the expense up front, RoundPoint increases the principal amount under Plaintiff's and Class Member's mortgages when it force-places the insurance, which was a new debt obligation for which new disclosures were required.

131.    RoundPoint adversely changed the terms of Plaintiff's loans after origination in order to allow a kickback on the force-placed insurance charges.   These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  RoundPoint never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to it or its affiliates.

132.    RoundPoint also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

133.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because RoundPoint's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

134.    Plaintiff and Class members have been injured and have suffered a monetary loss arising from RoundPoint's violations of TILA.

135.    As a result of RoundPoint's TILA violations, Plaintiff and Class members are

10P6117

entitled to recover actual damages and a penalty of $500,000.00 or 1% of RoundPoint's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

136.    Plaintiff and Class members are also entitled to recovery of attorneys' fees and costs to be paid by RoundPoint, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff, on behalf of himself and all Class members similarly situated, seeks a judgment in his favor against RoundPoint awarding actual damages and a penalty of $500,000.00 or 1% of RoundPoint's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by RoundPoint, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VI

### Violation of RICO, 18 U.S.C. § 1962(c)
### (against all Defendants)

137.    Plaintiff Belanger re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

138.    At all relevant times, Defendants employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

139.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included RoundPoint, Great American, Loan Protector and their affiliates.

140.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiff and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses

associated with servicing RoundPoint's entire loan portfolio, and concealing from Plaintiff and Class members the true nature of those charges. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

141.   The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

142.   RoundPoint, Loan Protector, and Great American conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and consisted of numerous and repeated violations of federal mail and wire fraud statutes which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

143.   RoundPoint, along with Loan Protector and Great American, directed and controlled the enterprise as follows:

a.   RoundPoint, Great American, and Loan Protector specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which RoundPoint agreed;

b.   Great American, Loan Protector, and RoundPoint drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from RoundPoint. The letters  fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by RoundPoint prior to being mailed to class members;

c.   Great American and Loan Protector ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking RoundPoint's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that an agency would be paid a fee as compensation for securing an individual policy;

d.   RoundPoint received kickbacks and below-cost mortgage servicing functions from Loan Protector and Great American to maintain the exclusive relationship and keep

41

their force-placed scheme moving forward;

e.  by directing, controlling, and creating an enterprise and arrangement by which RoundPoint would receive unearned kickbacks;

f.  by directing, controlling, and creating an enterprise and arrangement by which RoundPoint would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, reinsurance, expense reimbursements, or credits that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

g.  by directing, controlling, and creating an enterprise and program by which RoundPoint received rebates on the cost of the insurance but never charged the borrowers its actual or effective cost to procure the lender placed policies;

h.  by designing and directing an exclusive arrangement by which RoundPoint manipulated the force-placed insurance market in order to artificially inflate the amounts it charged to borrowers for force-placed insurance.  The charges were inflated to provide RoundPoint with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted mortgage servicing, and/or to provide RoundPoint with lucrative debt forgiveness or reinsurance payments.  Great American and Loan Protector benefited by securing business from RoundPoint—they provide kickbacks to RoundPoint at the expense of the borrowers who are charged the inflated charges;

i.  by developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

j.  by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

144.   In order to further their control and direction of the enterprise, Great American and Loan Protector paid bribes and kickbacks in the form of unearned commissions, direct payments, expense reimbursements, reinsurance payments, and below cost mortgage servicing.

145.   As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff and Class members with the intent to

42

defraud and deceive Plaintiff and Class members.

146.    For example, Great American and Loan Protector, with the approval of RoundPoint, sent form letters to Plaintiff on RoundPoint letterhead through the U.S. Mail, stating that RoundPoint would purchase force-placed coverage if voluntary insurance was not secured by a certain date.  Specifically, to Plaintiff, it was represented in the letters that RoundPoint would "buy" the required coverage that would cost Plaintiff Belanger $4,836.30.  In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiff was charged represented the actual cost of the policies, when in fact RoundPoint paid less for the insurance due to the inclusion of the kickbacks and other costs paid as bribes to RoundPoint that resulted in an effective rebate.  Defendants engaged in similar conduct as to all class members.

147.    Defendants also knowingly and intentionally fostered the mistaken impression that RoundPoint was actively obtaining a policy for the borrower when in fact no work was done and no expenses were incurred by RoundPoint or its affiliates because a master policy was already in place and the force-placed insurance was issued pursuant to the automated procedures in place.

148.    None of the letters sent to Plaintiff disclosed the financial arrangement between the Defendants.

149.    Defendants had a duty to correct these misstatements and mistaken impressions. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiff unreasonably high amounts for force-placed insurance and were designed to lull Plaintiff and the Class into believing that the charges were legitimate.

150.    Plaintiff and the other homeowners would not have paid, or would have contested these specific charges had RoundPoint disclosed that the illegal bribes and kickbacks were

10P6117

included and that RoundPoint was effectively paying less for the force-placed insurance than what it charged to Plaintiff and the Class members. Letters such as these were sent to Plaintiff Belanger on March 22, 2016, April 21, 2016, June 20, 2016, and July 5, 2016.

151.    Great American and Loan Protector, with the approval of RoundPoint, also sent form letters to Plaintiff and the Class members informing them that force-placed insurance had been purchased. The letters represented that RoundPoint would add the cost to Plaintiff's mortgage loan account. Thus, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance that Plaintiff and Class Members were charged represented the true cost of the force-placed coverage. In fact, the amount charged to Plaintiff was less than what RoundPoint actually paid for the insurance coverage because it included "commissions," reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned to RoundPoint but not passed on to Plaintiff or the borrowers. Letters such as these were sent to Plaintiff Belanger on March 22, 2016, April 21, 2016, June 20, 2016, and July 5, 2016.

152.    The omission was material, as it gave Defendants a colorable reason to charge Plaintiff unreasonably inflated amounts for insurance and would have influenced Plaintiff's decision to pay the charges or contest them. Plaintiff would not have paid or would have contested the charges for force-placed insurance had he known that the amounts charged to him were more than what RoundPoint paid for the insurance or included kickbacks to RoundPoint. Letters such as these were sent to Plaintiff Belanger March 22, 2016, April 21, 2016, June 20, 2016, and July 5, 2016.

153.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce

numerous materials, including but not limited to the notices and letters described above informing Plaintiff and Class members that they could charge Plaintiff and Class members unreasonably high amounts for force-placed insurance.  This scheme to defraud proximately injured Plaintiff and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property. Had they known that the charges had been artificially inflated to include kickbacks and other improper charges and that they were paying more than what RoundPoint ultimately paid, they would not have paid them or would have contested them.  Defendants also transferred sums among themselves, including but not limited to "fees," or "commissions" to Loan Protector to cover the below-cost mortgage servicing functions it provided in furtherance of their scheme to defraud Plaintiff and Class members, in violation of the wire fraud statutes.

154.   By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiff and Class members seek compensatory damages, treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

### COUNT VII

### Violation of RICO, 18 U.S.C. § 1962(d)
### (against all Defendants)

155.   Plaintiff re-alleges and incorporates the paragraphs above herein as if fully set forth herein.

156.   At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate,

directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

157.    RoundPoint, Loan Protector, and Great American illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- Through Loan Protector, agreeing that Great American would be RoundPoint's exclusive force-placed insurance providers and would extract unreasonably inflated amounts from RoundPoint's customers.   RoundPoint also agreed that Great American and Loan Protector would pay kickbacks to RoundPoint and its affiliates;

- Agreeing that Loan Protector and Great American would administer the LPI program and monitor RoundPoint's mortgage portfolios for lapses in voluntary insurance and would, with the approval of RoundPoint, send misleading notices to borrowers.   These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be force-placed, the borrower would be charged the "cost" of the insurance";

- Entering into illusory commission, reinsurance, or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

- Agreeing to commit two or more predicate acts as described above in Count VII.

158.    Through "soft-dollar" or other credits, or cash payments RoundPoint affiliates pass profits from this scheme to RoundPoint.

159.    RoundPoint committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

160.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class members suffered damages in the form of unreasonably high force-placed insurance charges.

**WHEREFORE,** Plaintiff and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against Great American and Loan Protector)

161.     Plaintiff re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

162.     Plaintiff and the Class members have advantageous business and contractual relationships with RoundPoint pursuant to the mortgage contracts.   Plaintiff and the Class members have legal rights under these mortgage contracts.   For example, Plaintiff and the Class members have a right not to be charged exorbitant amounts attributed to force-placed insurance in bad faith.

163.     Great American and Loan Protector had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiff and the Classes and RoundPoint.  Great American and Loan Protector were not parties to the mortgage contracts, nor were they third-party beneficiaries of the mortgage contracts.  Further, Great American and Loan Protector did not have any beneficial or economic interest in the mortgage contracts.

164.     Great American and Loan Protector intentionally and unjustifiably interfered with Plaintiff's and the Classes' rights under the mortgage contracts, as described above, by, inter alia, entering into an exclusive relationship with RoundPoint and/or its affiliates, whereby Loan Protector provided RoundPoint with below-cost mortgage servicing functions and Great American provided kickbacks in the form of "commissions" or "expense reimbursements," or ceded reinsurance premiums, among other things, which are purposefully and knowingly charged to Plaintiff and the Class members, to RoundPoint in exchange for the exclusive right to be the force-place insurance provider.

10P6117

165.    As a result of Great American's and Loan Protector's interference with Plaintiff's and Class members' mortgage agreements, Defendant RoundPoint breached the express and implied terms of its mortgage contracts with Plaintiff and the Classes, by using funds that were designated to pay insurance, taxes, and other items, in order to pay non-designated costs of Defendants, including kickbacks, reinsurance premiums, and subsidized mortgage servicing functions (i.e. new loan boarding, loss drafts) that have no relation to the placement of force-placed insurance.

166.    Plaintiff and the Classes have been damaged as a result of Great American's and Loan Protector's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiff, on behalf of himself and all Class members similarly situated, seeks a judgment in his favor against Great American and Loan Protector for the actual damages suffered by him as a result of the tortious interference.  Plaintiff also seeks all costs of litigating this action, including attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against RoundPoint as follows:

1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and his counsel to be representatives of the Classes sought in this complaint;

2)    Enjoining Defendants from continuing the acts and practices described above;

3)    Awarding damages sustained by Plaintiff and the Class members as a result of

10P6117

RoundPoint's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

4)   Finding that RoundPoint has been unjustly enriched and requiring it to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

5)   Awarding Plaintiff Belanger and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

6)   Awarding damages sustained by Plaintiff and the Class members as a result of the Great American's and Loan Protector's tortious interference with the mortgage agreement;

7)   Awarding Plaintiff and Class members costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Classes' counsel and experts, and reimbursement of expenses;

8)   Awarding actual damages and a penalty of $500,000 or 1% of RoundPoint's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3);

9)   Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

10)   Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Classes request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 31st day of August, 2017.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:    (305) 372-3508<br>*Counsel for Plaintiff* | Lance A. Harke, Esq.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, FL 33138<br>Telephone:      (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiff* |
| Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, FL 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* | |

10P6117