UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-23307-CIV-COOKE/GOODMAN

AUSTIN BELANGER,
on behalf of himself and all others similarly
situated,

       Plaintiff,

v.

ROUNDPOINT MORTGAGE
SERVICING CORPORATION, and
GREAT AMERICAN E&S INSURANCE
COMPANY and WILLIS OF OHIO, INC.
D/B/A Loan Protector Insurances Services,

       Defendants.
_____/

**SETTLING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT, APPLICATION FOR CASE CONTRIBUTION AWARD,
CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES,
AND INCORPORATED MEMORANDUM OF LAW**

# INTRODUCTION

Class Counsel are proud to present for final approval a class action settlement on behalf of mortgagors nationwide who had insurance coverage "force placed" on their properties by Defendant RoundPoint Mortgage Servicing Corporation ("RoundPoint") in conjunction with its force-placed insurance program and Defendants Great American E&S Insurance Company ("Great American"); and Willis of Ohio, Inc., f/d/b/a Loan Protector Insurance Services ("Willis of Ohio") (together, RoundPoint, Great American, and Willis of Ohio are referred to as "Defendants") that will make available more than $2 million in meaningful monetary relief to the 18,057-member settlement class and ensure that the alleged lender-placed insurance ("FPI" or "LPI") practices that are the subject of this lawsuit will not continue.[1] This settlement follows final approval of seventeen similar LPI settlements in this District,[2] all of which earned approval after many years of hard-fought litigation of largely the same claims and defenses that were at issue in this case. Like the settlements in those cases, this settlement will make available significant monetary relief to 18,057 RoundPoint borrowers nationwide who had hazard, flood, or wind lender-placed insurance coverage placed on their properties. This settlement resolves the claims of these RoundPoint borrowers by making available more than $2 million in monetary relief. The prospective portion also guarantees that the LPI practices that were the subject of this litigation, including the "commissions" and other illegitimate payments allegedly paid to RoundPoint and its affiliates, will not occur in the future. As of the date of this filing, the parties have received no objections to final approval of the proposed Settlement and three opt-outs to the proposed Settlement.

---

[1] Capitalized terms have the meanings given in the Settlement Agreement attached as Exhibit A to Plaintiff's motion for preliminary approval (D.E. 102-1).

[2] *See Circeo-Loudon v. Green Tree Servicing*, No. 14-cv-21384 (S.D. Fla.); *Jackson v. U.S. Bank*, No. 14-cv-21252 (S.D. Fla.); *Almanzar v. Select Portfolio Servicing, Inc.*, No. 14-cv-22586 (S.D. Fla.); *Wilson v. EverBank, N.A.*, No. 14-cv-22264 (S.D. Fla.); *Braynen v. Nationstar Mortgage, LLC*, No. 14-cv-20726 (S.D. Fla.); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.); *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474 (S.D. Fla.); *Ziwczyn v. Regions Bank*, No. 15-cv-24558 (S.D. Fla.); *Beber v. BB&T*, No. 15-cv-23294 (S.D.Fla.); *McNeil v. Loancare*, No. 16-cv-20830 (S.D. Fla.); and *McNeil v. Selene Finance LP*, No. 16-cv-22930 (S.D. Fla.).

This result is all the more extraordinary because it involved the resolution of complex issues against a rising tide of adverse decisions from federal districts, including this one, and appellate courts—decisions Class Counsel would certainly distinguish, but their opponents would just as vigorously assert. For this achievement, Class Counsel are asking the Court to award them $406,865 in fees and expenses, negotiated only after all class benefits had been secured under the direct supervision of a nationally recognized mediator, and payable by Defendants beyond and outside of the benefits to the Class. Such a fee would amount to approximately 20% of just the monetary recovery (not including the injunctive relief) available to the Class, and is well within the parameters established by the Eleventh Circuit, as that court recently confirmed in *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 629 (11th Cir. 2015).

This Settlement was achieved in a climate where federal courts, including this one, have been dismissing many of the same claims raised here by granting motions to dismiss or denying motions for class certification. Class Counsel respectfully request that the Court grant final approval of the Settlement, and approve the application for attorneys' fees and costs and the Settling Plaintiff's service award. A proposed order is attached hereto as **Exhibit A**.

<b><u>FACTUAL BACKGROUND</u></b>

1.  **<u>Defendants' FPI Practices</u>**

The standard form mortgage that RoundPoint owns or services requires the borrower to maintain hazard, wind, and, where applicable, flood insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse. The mortgage agreement advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage. Settling Plaintiff had insurance coverage force-placed on his property by RoundPoint, and challenges RoundPoint's arrangement with the Defendants and their subsidiaries or affiliates. Settling Plaintiff alleges that Defendants sought to artificially inflate borrowers' premiums with costs well beyond the cost of coverage, including kickbacks to RoundPoint or its affiliates, subsidies for below-cost servicing, and other costs unrelated to the procurement of new coverage.

2.  **The *<u>RoundPoint</u>* <u>Litigation</u>**

The background and procedural history of this matter is set forth in the Joint Declaration of Class Counsel, attached as **Exhibit B** ("Joint Decl.").

3. <u>The Settlement Terms and Agreement</u>

A. *The Proposed Class*

The Settlement Agreement provides relief to "all borrowers in the United States who," from November 1, 2012 to the date of entry of the Preliminary Approval Order ("Settlement Class Period"), inclusive of those dates, were charged by "RoundPoint under an LPI Policy for Residential Property, and who, within the Settlement Class Period, either (i) paid to RoundPoint the Net Premium for that LPI Policy or (ii) did not pay to and still owe RoundPoint the Net Premium for that LPI Policy." (Ex. A ¶¶ 3.1, 3.2.) This class will include borrowers whose homes are in foreclosure and short sale, and those granted a deed in lieu of foreclosure or loan modifications.[3]

B. *Monetary and Injunctive Relief*

The Settlement Agreement affords members of the Settlement Class significant monetary and injunctive relief. (*Id.* ¶ 4.) The monetary relief will compensate class members for a significant part of the allegedly inflated portion of the amounts that they either paid or were charged for force-placed coverage. All Settlement Class members who submit a valid claim form will recover 6.75% of the net premium *charged* to them during the class period. (*Id.* ¶ 4.7.) The percentage payment or credit is taken from the entire premium, rather than the alleged "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for coverage. Qualified members will receive a check or a credit for the full settlement amount. (*Id.*)

The injunctive relief provided by the Settlement Agreement will put an end to the alleged FPI practices that are the subject of this lawsuit. The Settlement Agreement enjoins RoundPoint and Great American from engaging in the alleged unlawful conduct that is the subject of the complaint. For a period of five years following the Effective Date, *inter alia*, RoundPoint is prohibited from accepting commissions as a result of the placement of an FPI policy; entering into quota-share reinsurance arrangements; or placing FPI through a RoundPoint-affiliated insurer or vendor. (*Id.* ¶ 4.2.1.) Great American is similarly prohibited

---

[3] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded certain categories that are included in this settlement from the Florida class it certified in February 2012. *Williams*, No. 11-cv-21233 (S.D. Fla. Feb. 21, 2012) (D.E. 211).

3

for five years following the Effective Date from providing FPI commissions to RoundPoint-affiliated agents or brokers or entering into quota-share reinsurance arrangements with RoundPoint or its affiliates. (*Id.* ¶ 4.3.1.)

The Settlement also requires RoundPoint to establish FPI hazard coverage at the last-known coverage amount and requires that the FPI policies be dual-interest, so that FPI coverage moving forward bears some relation to the value of the interest it protects and borrowers are able to make claims on the policies. (*Id.* ¶ 4.2.1.) Finally, the Settlement requires RoundPoint to refund any amounts due to the borrower for hazard FPI once voluntary insurance is put back in place within fifteen days of receipt of evidence of voluntary coverage. (*Id.*) Willis of Ohio similarly must continue to follow applicable state or federal statutes, regulations, rules, or orders related to the placement of LPI Policies on Residential Property. (*Id.* ¶ 4.4.1.)

### C. *Release of Claims against Defendants*

Class Counsel, with the agreement of the Defendants, are proud to inform the Court that after preliminary approval of the settlement, the parties have received comments from class members and various attorneys general of different states, and as a result of those contacts, have agreed to narrow the release provided to the Defendants in this matter by the Settlement Class. This is more beneficial to the Settlement Class Members, and brings the language of the release in line with a number of other releases approved by this Court in past LPI settlements. The full Release language is attached hereto as **Exhibit C**. This Release language is further incorporated into the proposed order attached as Exhibit A.

### D. *Class Notice*

The Settlement Agreement provides that Noticed Class Members will be sent notice of the Settlement, by first-class mail at their last known mailing address, in the form of notice attached to the Settlement Agreement.[4] (*Id.* ¶ 6.1.; *see also* Declaration of Jennifer M. Keough Regarding Notice Administration ¶ 6 ("Keough Decl.") attached as **Exhibit D**.) The Court's

---

[4] In the event that a notice is returned as undeliverable, the Settlement Administrator must access the National Change of Address database and attempt to locate the class member. (D.E. 102-1 ¶ 6.1.1.)

4

Preliminary Approval Order[5] required the notice to be mailed no less than ninety days before the final approval hearing. (D.E. 107 ¶ 9.2.) The Settlement also provides that the Administrator establish a website on which Settlement Class Members can download or print a claim form and review the Settlement Agreement, and upload and file a claim form electronically. (D.E. 102-1. ¶¶ 6.2, 7.2.) It also requires the Administrator to establish a toll-free number (that class members can call for information, or to raise any questions or concerns) no fewer than 90 Days before the Final Approval Hearing and publish notice of the settlement in *USA Today* no fewer than 45 Days before the Final Approval Hearing. And, the Settlement Agreement provides that advertisements of the settlement directed to Noticed Class Members will be published on the internet, beginning not less than 60 days before the Final Approval Hearing. (*Id.* ¶¶ 6.3, 6.4, 6.5.) Noticed Class Members may opt out of the Settlement by sending a request for exclusion to the Settlement Administrator as detailed in the Settlement Agreement. (*Id.* ¶ 11.) The notice plan has been effectuated according to the Settlement Agreement and the Court's Preliminary Approval Order. *See* Keough Decl.

### E. *Claims Process*

Pursuant to the Settlement, to obtain relief from Defendants, Settlement Class Members must submit the claim form on or before a deadline that will be 60 Days after the Final Approval Hearing. (D.E. 102-1 ¶ 2.10.) The claims will be reviewed and approved by the Settlement Administrator, who will make a determination of the amount owed to each class member using Defendants' electronic records, and then within the later of (a) thirty (30) days after submitting the final list of all valid Claims described in Section 7.4.2. of the Settlement Agreement or (b) the Effective Date, the Settlement Administrator shall mail checks in the appropriate amounts of Claim Settlement Relief to Claimants on such list. (*Id.* ¶ 7.4.3.) The Settlement Administrator is required to advise Class Counsel on a weekly basis of any Claims deemed invalid before those Claims are denied so that Class Counsel may follow up with the

---

[5] This Court preliminarily approved the settlement on October 12, 2018 (D.E. 109) by approving the September 28, 2018 Report and Recommendations on Joint Motion For Preliminary Approval of Class Action Settlement, Certifying Settlement Class For Settlement Purposes, Directing the Issuance of Class Notice, and Scheduling a Final Approval Hearing (D.E. 107.) These docket entries collectively shall be referred to as the "Preliminary Approval Order." Judge Cooke thereafter referred this matter to this Court for all purposes, including entry of a final judgment, on October 17, 2018. (D.E. 112.)

5

borrower to cure any deficiency in his or her submission. The Settlement Administrator shall also send a notice to Claimants submitting deficient Claims identifying the deficiency. Any defective, incomplete, or inaccurate Claim Form may be cured, and shall be accepted by the Administrator so long as the original Claim Form was timely submitted and the deficient Claim is cured within 30 Days after Claim Deadline. (*Id.* ¶ 7.3.1.) The parties agree to attempt to resolve any disputes related to the denial of class member claims in good faith.

    **F.** ***Class Counsel Fees and Expenses and the Settling Plaintiff's Case Contribution Award***

    The Court has already designated the law firms of The Moskowitz Law Firm, PLLC and Harke Law LLP to serve as Lead Class Counsel for the class. *See* Preliminary Approval Order. Pursuant to Section 14 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $406,865. (D.E. 102-1 ¶ 14.1.) Defendants also agree to pay a Case Contribution Award to Settling Plaintiff Austin Belanger in the amount of $5,000. (*Id.* ¶ 14.6.) The Court will consider whether to grant or deny these awards separate and apart from its analysis of the fairness, reasonableness, and adequacy of the settlement. (*Id.* ¶ 14.7.)

**4.**  **Preliminary Approval and Settlement Administration**

    The Court preliminarily approved the Settlement and certified the proposed Settlement Class on October 12, 2018. (Preliminary Approval Order (D.E. 109) (adopting D.E. 107).) The Court approved all terms, including the proposed Notice and notice plan, and ordered the parties to mail the Notice, Claim Instructions, and Claim Form to all class members. (*Id.*)

    The Settlement Administrator, JND Legal Administration ("JND"), obtained class member records from Defendants, including the last-known mailing addresses for all persons meeting the class definition. (Keough Decl. at ¶ 4.) JND updated the mailing list and standardized the address information using the National Change of Address database. (*Id.* ¶ 5.) JND mailed a total of 18,057 mail notices. (*Id.* ¶ 6.) JND also activated the settlement website (*id*. at ¶ 10), and on December 14, 2018, commenced a targeted internet banner advertisement campaign. (*Id.* ¶ 8). JND published a summary notice in *USA Today* on January 7, 2019 (*id*. ¶ 9), and established a toll-free telephone line that is accessible 24 hours a day, 7 days a week for Class Members who seek additional information. (*Id.* ¶ 12.)

    The deadline for opt-outs or objections is February 12, 2019. As of the date of this filing, JND had received only 3 valid opt-out requests, representing only .017% of the settlement class.

6

(*Id.* ¶ 17.) As of the date of this Motion, no objections have been filed or received by JND. (*Id.* ¶ 15.)

## LEGAL ARGUMENT

### I. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-cv-186, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted). For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted). Courts in this circuit consider the following factors: (1) the existence of fraud or collusion behind the settlement; (2) complexity, expense and duration of litigation; (3) the stage of proceedings at which the settlement was achieved; (4) the likelihood of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and the substance and amount of opposition received. *See Saccoccio v. JP Morgan Chase Bank, N.A.,* 297 F.R.D. 683, 691-94 (S.D. Fla. 2014); *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994). "In assessing these factors, the Court 'should be hesitant to substitute ... her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991)). Analysis of these factors compels the conclusion that the Court should approve the Settlement.

### A. The RoundPoint Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations among Experienced Counsel.

The first factor for final approval requires the Court to consider whether the settlement was obtained by fraud or collusion among the parties and their counsel. Courts begin with a presumption of good faith in the negotiating process. *See Saccoccio,* 297 F.R.D. at 692 ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion"); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement"). The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arm's length. The parties'

7

settlement negotiations were supervised by Rodney Max, a well-respected mediator with significant experience resolving complex suits. (Joint Decl. ¶¶ 16, 41.)

The parties, through regular telephonic sessions and email communications, and with the assistance of Mr. Max, negotiated first the terms of an initial memorandum of understanding and then a final settlement agreement. (*Id.*) Mr. Max has significant experience mediating complex commercial suits to resolution, and was involved in every step of the process. (*Id.* ¶ 41.) The very fact of his involvement weighs in favor of approval. *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of special master to oversee mediation evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' negotiations were also informed by considerable discovery and institutional knowledge obtained by Class Counsel in litigating LPI claims in multiple class actions over the last six years. (Joint Decl. ¶¶ 37-39); *see, e.g., Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.).

**B. The Issues Presented Were Highly Complex and Settlement Approval Will Save the Class Years of Extremely Costly Litigation in this Court and on Appeal.**

This case involves complex legal claims and defenses brought on behalf of 18,057 class members, and includes claims for complex common-law contractual, quasi-contractual, and tort claims as well as claims for violations of the federal Truth in Lending and RICO statutes. (D.E. 42.) Litigating these claims would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Settling Plaintiff ultimately prevailed in this litigation (which Defendants contest), that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides. (Joint Decl. ¶¶ 44-49); s*ee, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement

8

provides, years of litigation would stand between the class and any such recovery. Hence, this second factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

By contrast, the Settlement provides immediate and substantial monetary relief to the Settlement Class, with payments approximating a significant percentage of Settlement Class Members' actual damages. (Joint Decl. ¶¶ 51-53.) This recovery is extremely favorable, and constitutes an excellent result. *See, e.g., Beber,* No. 15-cv-23294 (S.D. Fla.) (D.E. 109) (approving similar settlement with payment percentages of 10%, 8%, and 5%); *Saccoccio,* 297 F.R.D. at 693 (return of 12.5% of premiums charged for FPI with prospective relief "very likely exceeds what Plaintiffs could have won at trial"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (range of 9% to 45% of damages was an "exemplary" result). These benefits come without the expense, uncertainty, and delay of continued and indefinite litigation. In light of the costs, uncertainties, and delays of litigating through trial—to say nothing of an appeal—"the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

### C. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Settlement.

Courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Prior to settlement, Class Counsel and their co-counsel had been litigating claims related to LPI for over six years, and had familiarized themselves thoroughly with the mechanics of the LPI industry. (Joint Decl. ¶ 43.) It was this knowledge that led the parties to enter into a settlement discussion. Further, before, during, and after mediation, Class Counsel confirmed details regarding Defendants' LPI program, the class members affected, and the amount at stake to ensure that the Settlement was fair and complete, and to confirm the value of the relief provided to the Class. (*Id.* ¶ 16.)

9

### D. Settling Plaintiff Faced Significant Obstacles to Obtaining Relief.

"[T]he likelihood and extent of any recovery from the defendants absent … settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("a court is to consider the likelihood of the plaintiffs' success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise"). Class Counsel and Settling Plaintiff believe they have a compelling case, but also recognize that Defendants would have raised significant defenses to all claims, including possible contractual defenses, failure to mitigate damages, statutes of limitation, and unclean hands. *See, e.g.*, D.E. 51. Although Settling Plaintiff and Class Counsel maintain that these defenses lack merit, had litigation continued, Settling Plaintiff and Class Members would have risked not prevailing on their claims. (Joint Decl. ¶¶ 4, 43-48). Further, the court in *Saccoccio* noted the "headwinds created by" the Eleventh Circuit in *Feaz v. Wells Fargo Bank, N.A.,* 798 F.3d 1098 (11th Cir. 2014) and the Seventh Circuit in *Cohen v. American Security Insurance Co.*, 735 F.3d 601 (7th Cir. 2013). *See Saccoccio,* 297 F.R.D. at 693; *see also*, *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2014 WL 4248208 at *1, *9 (S.D. Fla. Aug. 27, 2014) (noting same). Had the parties continued to litigate, Settling Plaintiff could have stood to recover nothing on behalf of a nationwide class.

### E. The Benefits Provided by the Settlement Are Fair, Reasonable, and Adequate When Considered Against the Possible Range of Recovery.

As explained above, the Settlement offers over $2 million in monetary benefits to the Class, as well as prospective relief and separately paid attorneys' fees. This will make available a significant percentage of Claimants' actual potential damages, which meets and likely exceeds the standards established by this and other courts. (Joint Decl. ¶¶ 51-52); *See, e.g., Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate . . . . A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]"); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of settlement is … a yielding of absolutes and an abandoning of highest hopes"). For example, in *Almanzar*, the Court approved a similar settlement with payments to the class amounting to 12.5%, 6.5%, or 5% of the net

premium charged to them. *See Almanzar v. Select Portfolio Servicing, Inc.,* No. 14-cv-22586, (S.D. Fla., D.E. 113.)

Similarly, in *LiPuma v. American Express Co.,* 406 F. Supp. 2d 1298 (S.D. Fla. 2005), this Court found that a settlement that recovered 8.1% of the possible damages was fair, adequate, and reasonable. When valuing the total recovery, this Court included the cash fund, the proposed value of the prospective relief, and the costs of notice and administration. *Id.* at 1322. The Court focused on "the possible recovery at trial" and evaluated the settlement in its "totality" and not on a "claim-by-claim" or "dollar-by-dollar" basis. *Id.* Further, the presence of "strong defenses to the claims" makes lower recoveries more reasonable, *id*; *see also Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 ("standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."),[6] and "when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *12 (S.D.N.Y. Sept. 16, 2011) (citation and quotations omitted).

Here, the Settlement Agreement provides that all Settlement Class Members are eligible to receive a cash payment or escrow credit of 6.75% of the net premium charged to them during the class period. (D.E. 102-1 ¶ 4.7.) This amount will be a percentage of the entire premium charged, some of which (Defendants contend all of it) legitimately went to purchasing insurance coverage to which RoundPoint was entitled to protect its interest in the borrower's property—*not* a percentage of the premium charged in excess of the actual or competitive cost of coverage. Moreover, all Settlement Class Members who submit a claim form will recover regardless of whether the Settlement Class Member paid any portion of that premium.

The percentage made available to many Settlement Class Members by the Settlement approximates the amount of the alleged "commissions" or "expense reimbursements" paid by borrowers subject to other lenders' alleged LPI schemes. *See, e.g., Kunzelmann*, No. 11-cv-81373

---

[6] *See also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (holding a 5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

11

(S.D. Fla.) (D.E. 115 at 2) (citing evidence that Wells Fargo charged an 11% "commission"). Moreover, more than forty-five state regulators have in recent years approved an LPI hazard insurance product developed by another LPI insurer that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by up to 12.5% if the lender agrees to forego the commissions and reinsurance profits that are the subject of this lawsuit. (Joint Decl. ¶ 54.) This supports a finding of reasonableness here.

The Settlement will also provide valuable prospective relief to the class. (Joint Decl. ¶¶ 2, 24-26.) The Settlement Agreement effectively ensures that the Defendants will not implement the practices challenged in the litigation. (*Id*.). The fact that the parties agreed to a "claims-made" settlement does not render its terms unreasonable. *See, e.g., Saccoccio*, 297 F.R.D. at 696 (overruling objections to claims-made process because "[t]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (citing to *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011)); *Casey v. Citibank*, No. 12-cv-820 (N.D.N.Y.) (D.E. 222 at ¶ 6) (approving virtually identical claims-made settlement and finding that regardless of the take rate, "[t]he settlement confers substantial benefits upon the Settlement Class members, is in the public interest, and will provide the parties with repose from litigation."); *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (discussing claims-made settlement and affirming contingency fee award based on total possible recovery); *Shames v. Hertz Corp.*, 07-cv-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (approving claims-made settlement over objections because "there is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted); *Lemus v. H & R Block Enters. LLC,* No. 09-cv-3179, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) (approving claims-made settlement where unclaimed funds reverted to the defendants); *Atkinson v. Wal-Mart Stores, Inc.*, No. 08-cv-691-T-30TBM, 2011 WL 6846747, at *5 (M.D. Fla. Dec. 29, 2011) (approving claims-made settlement with full reversion).

Notably, settlements related to LPI programs from other insurers with New York state regulators were also claims-made settlements. *See* Consent Order, *In the Matter of QBE Fin. Institution Risk Servs., Inc., QBE Ins. Corp., & QBE Holdings Inc*. (N.Y.D.F.S. 2013), available at http://www.dfs.ny.gov/about/ea/ea_201304181_qbe.pdf (collectively "NYDFS Consent Order"). Settling Plaintiff and the Class faced significant hurdles in litigating their claims to

resolution. Each class member stands to recover hundreds, if not thousands, of dollars as a result of the Settlement. These results fall well within the range of reasonableness.

### F. The Opinions of Class Counsel, the Settling Plaintiff, and Absent Class Members Strongly Favor Settlement Approval.

A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988). This Court has already found that Class Counsel and Settling Plaintiff will adequately represent the class in this action, and its conclusion was warranted. (D.E. 107 at ¶ 5(e) ("Settling Plaintiff is capable of fairly and adequately protecting the interests of the members of the RoundPoint Settlement Class, in connection with the Settlement Agreement.").)

Class Counsel have been investigating LPI practices for more than six years and fully support the Settlement. Among other things, they obtained certification of the first LPI class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla. Feb 21, 2012), litigated the motions for class certification in *Montoya* and *Beber*, briefed and argued two motions to centralize LPI litigation in a nationwide MDL, obtained final approval of the settlements in *Saccoccio*, *Hall*, *Fladell*, *Diaz*, *Hamilton*, *Braynen, Wilson*, *Lee*, *Jackson*, *Circeo-Loudon*, *Montoya*, *Beber*, and *Almanzar*, among others, and are currently litigating additional cases against major mortgage lenders before this Court and others.[7] Based on this specific experience, and decades of experience, litigating consumer class action lawsuits, it is Class Counsel's informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class. (Joint Decl. ¶ 92.)

As of January 28, 2019, of the 18,057 class members, 0 have objected and only 3 have filed a valid opt-out request. (Keough Decl. ¶¶ 15, 17.) This overwhelming class support is evidence of the Settlement's fairness. *See, e.g., Saccoccio*, 297 F.R.D. at 694 (opposition amounting to 0.018% of the class was termed as "low resistance to the settlement" and weighed "in favor of approving the settlement."); *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices). Viewed either

---

[7] *See, e.g., Checa Chong v. New Penn Financial, LLC,* No. 18-cv-80948-RLR (S.D. Fla.).

13

independently or taken together, the above factors confirm that the Settlement is fair, reasonable, and adequate and in the best interests of the Class.

II.     **CLASS COUNSEL SHOULD BE AWARDED REASONABLE FEES AND COSTS AND SETTLING PLAINTIFF THE REQUESTED SERVICE AWARD.**

For their extensive work prior to the filing of the complaint and throughout the pre-trial and settlement phases of this litigation, Class Counsel seek $406,865.00 in attorneys' fees and expenses, equaling 20% of the more than $2 million in monetary settlement benefits made available to the Class, excluding the valuable and important prospective relief. A service award of $5,000 to the Settling Plaintiff is also appropriate.

A.     **The Court Should Award the Requested Attorney's Fees and Expenses.**

Class Counsel is entitled to attorneys' fees for the benefit obtained in the Class Settlement. *See Saccoccio*, 297 F.R.D. at 695 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."); *Casey*, No. 12-cv-00820 (N.D.N.Y.) (ECF No. 223); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 676 (1980); *David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant). In the Eleventh Circuit, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *see also Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007); *In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001). The percentage applies to the total benefits provided, even where the actual payments to the class following a claims process is lower. *See Poertner*, 618 Fed. App'x at 630; *Saccoccio*, 297 F.R.D. at 695; *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295–96 (11th Cir. 1999); *see also Casey*, No. 12-cv-00820 (N.D.N.Y.) (D.E. 221) (the amount of claims made is "irrelevant to the underlying issue; to wit, whether the proposed settlement agreement is fair, reasonable, and adequate").

"[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added; awarding fees of 31½% of settlement fund). Here, the requested

14

percentage falls within or below the range provided by the Eleventh Circuit. *See Camden I,* 946 F. 2d at 774 (20%–50% of the value provided); *David*, 2010 WL 1628362 at *8 n.15 (20%–50% of common fund is "the customary fee in class actions that result in substantial benefits").

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I,* 946 F.2d at 772 n.3. The Court may also consider the time required to reach settlement, the existence of substantial objections and non-monetary benefits, and the economics of prosecuting a class action. *Id.* at 775. As explained below, the factors set forth in *Camden I* support the full award requested.

1. **The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action Support the 20% Award.**

A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high. *See Pinto*, 513 F. Supp. 2d at 1339. These factors weigh in favor of awarding Class Counsel 20% of the cash benefits obtained. Class Counsel received no compensation during the course of this litigation and have incurred expenses on behalf of the Class, which they risked losing had Defendants prevailed. (Joint Decl. ¶¶ 85–87, 91.) From the time Class Counsel filed suit, there existed a real possibility that Class Counsel would receive no compensation.

2. **The Requested Fees Reflect the Market Rate in Complex, Contingent, Litigation.**

A fee of 20% of the cash value is below the market for class actions. *See Saccoccio*, 297 F.R.D. at 695 ("20-30% fee that is customary in common fund cases."). "The percentage method of awarding fees in class actions is consistent with, and is intended to mirror, practice in the private marketplace where attorneys typically negotiate percentage fee arrangements

with their clients." *Pinto*, 513 F. Supp. 2d at 1340. In private litigation, attorneys regularly contract for contingent fees between 25% and 33% directly with their clients. These percentages are the prevailing market rates throughout the United States for contingent representation. *See id.* at 1341 (citing, *inter alia*, *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986)). In making a determination of what constitutes a fair fee, this Court should be guided by such awards.[8]

A fee of approximately 20% of the total monetary benefits obtained is consistent with and falls well within, if not below, the range of the customary fee awarded in common fund cases. *See, e.g., Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 at (D.E. 178) (awarding 16% of the total monetary benefits provided).

### 3. The Novelty and Difficulty of the Questions at Issue

This case presents difficult questions of law and complex issues of fact. Class actions are generally complex, but this one is particularly so, involving: federal statutes, insurance issues such as analyzing loss ratios, calculation of premiums, and identifying permissible costs of insurance charged to borrowers; defenses that contemplate the actions of insurance regulators or go to the conduct of the borrower in allowing voluntary coverage to lapse (first breach, unclean hands); "consent" defenses involving payment/maintenance of LPI after disclosures that it would be expensive, *e.g.,* voluntary payment, waiver, and estoppel. The difficulty of litigating these issues amply supports the full award requested. (Joint Decl. ¶¶ 77–82.)

### 4. The Skill, Experience, and Reputation of Class Counsel

Class Counsel have established their skill, experience, and reputation in the record, and in repeated cases before this Court. Indeed, this Court stated that "class counsel has been at the forefront of lender-placed insurance litigation." *See Saccoccio*, 297 F.R.D. at 695. Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results they have achieved. They resolved this dispute efficiently despite the potential hurdles and the arguments raised by Defendants. The quality of Class Counsel and their achievement in this case is equally shown by the strength of their opponents. Defendants' counsel are reputable firms known for

---

[8] *See also, e.g., Gutter v. E.I. Dupont De Nemours & Co.,* 95–2152–Civ–Gold (S.D. Fla. May 30, 2003) (33-1/3 %); *Waters,* 190 F.3d 1291 (affirming 33-1/3%); *Tapken v. Brown,* Case No. 90-0691-CIV, 1992 WL 178984, Fed. Sec. L. Rep. P 96805 (S.D. Fla. 1995) (33%); *In re Home Shopping Network Sec. Litig.,* Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33%).

the skills and achievements of their attorneys. Thus, this factor also favors awarding the requested fee.

### 5. The Result Achieved for the Class

The result achieved is a major factor to consider in making a fee award and here, it is significant and perhaps best establishes the propriety of the requested fee award. *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at 547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). In considering the results, courts examine the value of *both* monetary and prospective relief. *See Poertner*, 618 Fed. App'x at 629; *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007); *LiPuma,* 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. Oct. 24, 2003). The results here, of more than $2 million in cash made available and the prospective relief, are excellent. Defendants are mandated to cease the key practices which are the gravamen of the litigation. These results are powerful evidence supporting the fee award.

### 6. The Time and Labor of Class Counsel

Investigating, prosecuting, and settling the claims here demanded time and labor. (Joint Decl. ¶¶ 68–73.) The complexity of this case required organization by Class Counsel, including assignment of work and regular meetings and calls to ensure coordinated, productive work efforts to maximize efficiency and minimize duplication of effort. Class Counsel spent many hours investigating the claims of many potential plaintiffs against Defendants in this action. (*Id.*) Class Counsel interviewed RoundPoint borrowers and potential plaintiffs to gather information about Defendants' conduct and its impact upon consumers. Class Counsel also obtained, reviewed, and analyzed RoundPoint mortgages, LPI policies, and the LPI notices sent to borrowers, and other discovery. (*Id.*)

### 7. The Reaction of the Class to the Settlement.

To date, there have been 0 objections and only 3 valid opt-out requests, which supports the fee request. *See Pinto*, 513 F. Supp. 2d at 1343; (Keough Decl. ¶¶ 15, 17.)

### B. A Case Contribution Award of $5,000 Is Appropriate.

The Court should approve a case contribution award of $5,000 for the Settling Plaintiff. The detailed notice advised Class Members that the Settling Plaintiff would apply for a case contribution award of $5,000, and, to date, no class member has objected to this reasonable

request. *See Saccoccio*, 297 F.R.D. at 695 (granting $5,000 service award). In instituting this litigation, the Settling Plaintiff has acted as a private attorney general seeking a remedy for what appeared to be a public wrong. *See Pinto*, 513 F. Supp. 2d at 1344. The Settling Plaintiff aided in the investigation of these claims and settlement. (Joint Decl. ¶¶ 64–65.) Private class action suits are a primary weapon in the enforcement of laws designed for the protection of the public. *See Pinto*, 513 F. Supp. 2d at 1344. Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.

## CONCLUSION

Settling Plaintiff and Class Counsel respectfully request that the Court grant final approval of the Settlement, as well as the applications for Class Counsel's fees and expenses and a class representative service award.

Respectfully submitted this 28th day of January, 2019.

By: */s/ Adam M. Moskowitz*
**Adam M. Moskowitz**

| | |
|---|---|
| Adam Moskowitz, Esq.<br>Florida Bar No. 984280<br>adam@moskowitz-law.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>howard@moskowitz-law.com<br>Joseph M. Kaye, Esq.<br>Florida Bar No. 117520<br>joseph@moskowitz-law.com<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>2 Alhambra Plaza<br>Suite 601<br>Coral Gables, FL 33134<br>Telephone: 305 740-1423<br>*Counsel for Plaintiff* | Lance A. Harke, Esq.<br>lharke@harkelaw.com<br>**HARKE LAW LLP**<br>9699 NE Second Avenue<br>Miami Shores, FL 33138<br>Telephone:   (305) 536-8220<br>Facsimile:   (305) 536-8229<br>*Counsel for Plaintiff* |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 28th day of January, 2019 and served by the same means on all counsel of record.

By: */s/ Adam M. Moskowitz*